**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

In re:                                )
                                      )
Edith I. Tarrant,                     )        Case No.: 05-12841-BGC-7
                                      )
            Debtor.                   )

**ORDER**

**I.  Background**

The trustee proposes a settlement of a lawsuit filed pre-petition by the debtor. The debtor opposes that settlement.  The specific matters before the Court are the trustee's <u>Motion to Approve Compromise of Controversy</u>, the debtor's objection to that motion, the <u>Application for Final Compensation and Reimbursement of Expenses for Special Counsel</u>, and the debtor's objection to that application.

A hearing was held on June 14, 2006.  Appearing were Ms. Tarrant, the debtor; Ms. Michelle Foy, Ms. Tarrant's daughter; Ms. Monica Austin-Hatcher, the debtor's bankruptcy attorney; Thomas Reynolds, the trustee; Don Hall, attorney for the trustee; and Mr. Thomas Corbett for the Bankruptcy Administrator.  The matters were submitted on the testimony of Ms. Tarrant and Mr. Hall, arguments, and the <u>Memorandum in Support of Debtor's Opposition of the Approval of the Motion to Compromise of Controversy and the Application for Final Compensation and Reimbursement of Expenses for Special Counsel</u> filed on June 26, 2006, by the debtor's bankruptcy counsel.

The issues before the Court are whether to approve the trustee's proposed compromise and whether to approve the special counsel's application for compensation and expenses.

**II.  Initial Findings of Fact
and Initial Conclusions of Law**

On September 12, 2002, the debtor suffered the unfortunate occurrence of a fire that severely damaged her home and her personal belongings.  The home and its contents were insured thorough a policy the debtor obtained from Horace Mann Insurance Company.

The debtor is frustrated by the events occurring after the fire.  Specifically the debtor's testimony expresses her frustrations with the real problems she had in obtaining personal items and having her house repaired.  Because of those problems,

before she filed her Chapter 7 case here, the debtor filed a complaint against the insurance company in state court. The debtor's state court complaint includes counts against an insurance company and a builder, and others for breach of contract, bad faith, and fraud. The settlement proposed here would resolve only the issues involving the insurance company. The settlement does not involve the issues against the builder. See Transcript at 6.

The debtor is also frustrated with the processes that govern her Chapter 7 case, her relationship with her attorneys, and the proposed settlement of the lawsuit she brought.

The debtor opposes the settlement. Specifically she asked the Court to allow her to attempt to negotiate a settlement that she believes would be better than the one negotiated by the trustee. Transcript at 59.

The first question to answer then is who may settle Ms. Tarrant's lawsuit.

### III.  Who May Settle the Debtor's Lawsuit?

The law is quite clear that if a debtor has filed a lawsuit, or has the right to file a lawsuit, after the debtor files a Chapter 7 case, that lawsuit, or whatever rights the debtor had in that lawsuit, belongs to the debtor's Chapter 7 bankruptcy estate. As such, the debtor's Chapter 7 trustee is the one who has the authority and responsibility to go forward with that suit.

The court in Byrd v. Potter, 306 B.R. 559 (Bankr. N.D. Miss. 2002) offers this explanation:

> Causes of action that accrued prior to the filing of a bankruptcy petition or prior to the debtor's discharge in bankruptcy "are property of the bankruptcy estate and may only be prosecuted by the bankruptcy trustee," the real party in interest under Rule 17(a) of the Federal Rules of Civil Procedure. Lawrence, 837 F.Supp. at 779-80.

Id. at 562.

Citing Byrd v. Potter, the court in Bexley v. Dillon Companies, Inc., 2006 WL 758474 (Bankr. D. Colo. 2006), reached these conclusions:

> [After the debtor filed her bankruptcy case]... her claims against Defendant came under the control of her Chapter 7 trustee. Plaintiff no longer has control over the legal interests potentially at issue in this case and, therefore, cannot assert claims that are properly in her bankruptcy estate and controlled by her Chapter 7 trustee. Thus, under Fed.R.Civ.P. 17(a), Plaintiff is not the real party in interest in this lawsuit.

2

Id. at *3.

Also explained in Bexley is, "Before her bankruptcy, therefore, she owned these assets, which constituted "choses in action." She had an obligation to list any chose in action as an asset of the estate. After the filing of the bankruptcy, the trustee became the only person who could pursue the debtor's choses in action." Id. (footnote omitted) (emphasis added).

And in this Circuit, the court in In re Degenaars, 261 B.R. 316 (Bankr. M.D. Fla. 2001) recognized:

Pursuant to 11 U.S.C. § 541, a trustee in bankruptcy succeeds to all causes of action held by a debtor at the time a bankruptcy petition is filed, including damages actions. See Jones v. Harrell, 858 F.2d 667, 669 (11th Cir.1988). Only a trustee may move for court approval of a compromise or settlement of a personal injury action that is property of a Chapter 7 estate. See id. However, a debtor may object to the approval of a compromise of a damages action if a debtor may receive some disbursement or refund from an estate or if a debtor is provided for in any way by a plan of reorganization. See In re Bicoastal Corp., 164 B.R. 1009, 1015 (Bankr.M.D.Fla.1993).

Id. at 319.

The situations described above are the same as the situation with Ms. Tarrant's lawsuit. She could pursue that lawsuit herself before she filed her Chapter 7 bankruptcy case, but when she filed her case, she gave up her right to control that case. Under the bankruptcy law, the trustee became the one entitled to control the lawsuit.

The reason why the trustee must be the one to prosecute actions such as the one Ms. Tarrant brought is also clear. A Chapter 7 trustee has serious fiduciary responsibilities. These are both broad and specific. The court in In re Kay, 223 B.R. 816 (Bankr. M.D. Fla. 1998) offers this description of those duties. It reads:

The Trustee owes a complex set of obligations and fiduciary duties to the bankruptcy estate. In re WHET, 750 F.2d 149 (1st Cir.1984) (stating a trustee is a "representative of the estate ... and as such he owes a fiduciary duty to debtor and creditors alike to act fairly and protect their interests."). The Bankruptcy Code sets forth the duties of the Chapter 7 Trustee to the Debtor under 11 U.S.C. § 704(1), which provides, in relevant part: "The trustee shall--(1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest...." Id.

3

****

A Chapter 7 Trustee has the duty to preserve estate assets for the benefit of creditors who will share in distribution of the estate and is obligated to gather and liquidate assets in an efficient manner in performing this duty to creditors. The Trustee's duties to the Debtor are not on the same plateau as estate creditors, even though there are mutual obligations to estate creditors and Chapter 7 Debtor. See e.g. In re Davis, 899 F.2d 1136, 1143 n. 15 (11th Cir.1990) ("[t]he bankruptcy trustee does not represent the interests of the debtor alone; rather he owes a complex set of obligations and fiduciary duties to the court, the debtor ... and, most importantly, the creditor.") (citations omitted).

Id. at 82.

This Court agrees.  A "Chapter 7 trustee's duty is to reduce to money the legal or equitable interests owned by the debtor in these various assets so that the proceeds may be distributed to unsecured creditors in accordance with Section 726."  In re Talbert, 268 B.R. 811, 819 (Bankr. W.D. Mich. 2001).

But, as recognized by the court in In re Degenaars, "a debtor may object to the approval of a compromise of a damages action if a debtor may receive some disbursement or refund from an estate or if a debtor is provided for in any way by a plan of reorganization."  Id.

Whether Ms. Tarrant has that right has not been questioned.[1]  And she has raised several objections to the proposed settlement.  Primarily, Ms. Tarrant told this Court that if she had known that her lawsuit would be devalued if she filed bankruptcy, she would not have filed.  That position relates directly to the questions she raises about her relationship with her attorneys and those attorneys relationships with the trustee.  After the Chapter 7 case was filed, the Chapter 7 trustee sought, and obtained, permission from this Court to hire the attorney who the debtor had hired to bring her action against the insurance company.  That attorney is the attorney who now recommends the settlement the trustee proposes.

With those relationships in mind, Ms. Tarrant became frustrated with her legal representation.   Because of that frustration, it is very important for the Court to explain how and why a Chapter 7 trustee may hire a "debtor's" attorney to complete the prosecution of an action the debtor started.

_____

[1]This Court has not considered the issue of whether the debtor had a right to object under this standard.

4

Section 327(e) of the Bankruptcy Code specifically allows a trustee to employ an attorney who has represented the debtor.  That section provides:

> The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e).

The practical reasons to allow that employment are that in almost every circumstance where an attorney has represented the debtor, that attorney can build on all of the work performed before which will almost always benefit the estate.

But of course the legal requirements of section 327 must be met.  The primary two are these: (1) the employment must be in the best interest of the estate; and (2) the attorney to be employed does not hold an interest adverse to the debtor.

As to the first, the court in In re Arrington, 282 B.R. 541, 534 (Bankr. M.D. Ga. 2002) wrote, "A Chapter 7 trustee, with the court's approval, may employ, for a specified special purpose, an attorney that has represented the debtor, if it is in the best interest of the estate." Id.

When this Court approved the employment of the attorneys for the trustee, **under the same terms which they were representing Ms. Tarrant**, this Court found that the employment would be in the best interest of the estate.  The prosecution of Ms. Tarrant's causes of action required an attorney with a certain expertise.  Having now heard the evidence in this case, this Court confirms that the employment was in the best interest of the estate.

As to the second requirement, the court in In re Abrass, 250 B.R. 432, 435 (Bankr. M.D. Fla. 2000) wrote, "To qualify for this narrow exception to Section 327(a), the trustee must establish... [among other things]... the attorney does not represent or hold any interest adverse to the debtor or to the estate concerning the matter at hand." Id.

This Court had that precise issue in an unrelated proceeding.  See In re Covenant Financial Group of America, Inc., 243 B.R. 450 (Bankr. N.D. Ala. 1999).  As in that case, the Court finds that the attorney employed by the trustee did not have an interest adverse to the interest of the debtor or the interest of the bankruptcy estate.  As described below in more detail in the explanation of the role of a trustee in a Chapter 7 case, "The primary role of a chapter 7 trustee in an asset case is to liquidate the debtor's nonexempt assets in a manner that maximizes the return to the debtor's

5

unsecured creditors." (www.uscourts.gov/bankruptcycourts/bankruptcybasics).
And, "[t]he individual debtor's primary concerns in a chapter 7 case are to retain exempt
property and to receive a discharge that covers as many debts as possible." Id.

Those are not in conflict here.  No objections to Ms. Tarrant's discharge have
been filed and there have been no objections to the dischargeability of any of her debts.
Consequently, Ms. Tarrant's unsecured debts will be discharged.  Whatever the trustee
is able to recover to pay these debts will benefit the creditors.   Ms. Tarrant will not
receive any additional benefit if they are paid.  She has received the greatest benefit
the Bankruptcy Code allows – a fresh start.

And factually, the evidence demonstrates that the interests of the attorney
employed by the trustee were the same as Ms. Tarrant's interests.  A question by Ms.
Foy and an answer by Mr. Hall read:

> Q.     You stated earlier that you felt like her – you sued them for breach of
> contract, bad faith and fraud, and you had told me and Edith in a meeting
> that we had with you after her bankruptcy that you felt like it would be hard
> to prove the bad faith and fraud.  At any point after you filed the lawsuit
> and you received the answers from Horace Mann stating that they were
> denying the bad faith and the fraud, did you at any point tell her that her
> case was less in merit or value because there was no bad faith or
> because there was no fraud?
>
> A.     I told her, I think more so after the bankruptcy was done because I told
> her it was going to hurt her case by doing that.  As far as the – I don't
> know that we ever got into the issues discussing what the claims were, but
> I typically don't get my clients involved in that, you know, because I am
> trying to get the most money I can for them because it is going to benefit
> me as much as them.

Transcript at 26.

But of course what frustrates Ms. Tarrant is that the trustee will not receive
additional funds from the lawsuit for her to be paid a dividend.  That of course is
unfortunate, but when Ms. Tarrant decided to file, and did file her Chapter 7 case,
certain events were inevitable.  The law is quite clear on this point also.  As stated
above, a "Chapter 7 trustee's duty is to reduce to money the legal or equitable interests
owned by the debtor in these various assets so that the proceeds may be distributed to
unsecured creditors in accordance with Section 726." In re Talbert, 268 B.R. 811, 819
(Bankr. W.D. Mich. 2001).

Whether Ms. Tarrant should or should not have filed bankruptcy is not a question
this Court should address.  It is clear to the Court that Ms. Tarrant was conflicted about
how she should proceed.  As noted above, in her testimony, Ms. Tarrant explained to

the Court that she would not have filed her bankruptcy case if she, "knew that ... [her] lawsuit would have no value." Transcript at 55 (parenthetical added). She added, "if I had been told that it would not merit me anything, I would not have filed." Transcript at 56. But in the objection to the trustee's proposed settlement she filed, she told the Court, "I filed bankruptcy as a result of my income being reduced in 2003 & 2004 from approximately $46,000 a year to $25,000 in 2005. I was forced early retired due to a medical disability." Proceeding No. 38. Before Ms. Tarrant retired she taught exceptional education in the Jefferson County, Alabama, school system for thirty years.

Ms. Tarrant also told the Court that the debts that would be discharged in bankruptcy were made up of mostly debts that did not relate to the fire. Transcript at 41-42.

The Court is very sympathetic to Ms. Tarrant's plight. She suffered something that most of us can only imagine – a terrible fire that destroyed her home, her possessions, and her life. Fortunately for Ms. Tarrant, she had insurance and now has the protections that filing bankruptcy has to offer.

Unfortunately, Ms. Tarrant's financial circumstances are similar to many of other debtors this Court has seen. Personal tragedies cause severe financial problems. Reduced income causes severe financial problems. Ms. Tarrant's situation is even more tragic as she has suffered both.

Ms. Tarrant testified, "when I had to file bankruptcy, that was one of the worst things that had ever happened because the bills that I have – and once I found out that I was going to have to file bankruptcy, I went in and I talked to Mr. Hall, and I told him that this was the last thing that I would attempt to do, would be to file bankruptcy, but I had no choice." Transcript at 56 (emphasis added). But she adds:

He did not tell me at that time, well, if you file, you will give up all of your rights. He just said to be sure to tell my bankruptcy lawyer that I had filed a bankruptcy case because if I – I mean that I had a pending lawsuit because, if I did not tell them, then my lawsuit would be void is what I understood from him. But if he had told me once you file, then you have no – I am not a client anymore, I would not have filed. I would have just taken my chances on being sued or whatever, but I knew that my finances had – you know, it had caught up with me and I couldn't pay all of my bills on a timely manner the way I had done in the past.

Transcript at 56-57.

Case 05-12841-BGC7    Doc 47    Filed 09/25/06    Entered 09/25/06 12:25:16    Desc Main
Document    Page 7 of 36

The fact that Ms. Tarrant may not have understood the consequences of filing a Chapter 7 case, makes the current circumstances even more difficult for her.[2]  But that does not change the law.  As discussed below, this Court is <u>required</u> to apply specific criteria to determine whether the trustee's proposed settlement should be approved.

## IV.  Additional Findings of Fact

### A.  Ms. Tarrant's Losses Associated with the Fire

As explained above, many of the debtor's arguments stem from her frustrations relating to the fire and subsequent events.  Those include problems regarding replacing and cleaning her clothes and other personal items, whether her home would be repaired or replaced, who would direct the reconstruction of her home, how would the costs of that reconstruction be paid, and would they be paid timely.

She explained:

> I do feel that I have suffered a lot and the attorneys did not hear this case and they don't know the hardship that the insurance company put me through by not paying in a timely manner.  I should have been back in my house in April of 2003 and, because the bills were not paid on time to the contractor, he told me that he was going out of business and that he was

---

[2] Ms. Tarrant's feelings about her relationships with her attorneys is best described by another exchange between Mr. Hall and Ms. Foy.  At one point in the trial, Ms. Foy asked Mr. Hall:

> After the bankruptcy was filed and Ms. Tarrant came to yourself thinking that she was still retained by your law firm to represent her in her case filing, did you state to her that you was no longer representing her and that you were representing the trustee and were you still advising her as an attorney, as her counsel?

Transcript at 35.

He answered:

> Well, I was still advising her, I guess you could say, about what was going on with the lawsuit but I believe I explained to her that my understanding of the law was that, when the trustee accepts responsibility, they become the client and they do.  They are the real party-in-interest in the Circuit Court.  So the claims would be pursued through them as opposed to her.  She is more like a witness in the case than she is really a plaintiff.

Transcript at 35-36.  This Court has not considered the issues this exchange raised.  While they are important to Ms. Tarrant, and the Court generally, they do not impact approval of the settlement.

8

selling his business to someone else, that he was trying to get his money.
He told me that, if he got his money in a timely manner, he could finish my
house up before he went out of business but that did not happen.  So I
was put in jeopardy then because he went on and released himself from
the job, and I had to seek another contractor which is another lawsuit
because that contractor did not fulfill everything in that contract.

Transcript at 58.

The fire at Ms. Tarrant's home occurred on September 12, 2002, between 9:00
and 10:00 a.m.  Transcript at 37.  Her home was insured by  Horace Mann Insurance
Company.  Transcript at 37.  After the fire, Ms. Tarrant became frustrated with her
situation.

In November 2003, about three to four months after moving back into her house,
Ms. Tarrant discussed her situation with an attorney.  Transcript at 38.  That attorney
associated another attorney.  The associated attorney's law firm were the attorneys
who then assisted Ms. Tarrant and filed the state court complaint for her.

While Ms. Tarrant testified that all of the repairs to her home have not been
completed she testified, "The building amount to redo my house was up to one hundred
and one thousand dollars.  Of that, ninety-one thousand plus was paid." Transcript at
38.

In regard to the losses she maintains she suffered, Ms. Tarrant testified,
"Thirty-eight thousand still remaining, unpaid personal items, and approximately thirty
thousand still remains in unpaid living expenses." Transcript at 50.

### B.  Ms. Tarrant's Bankruptcy Filing

In her testimony, Ms. Tarrant explained to the Court that she would not have filed
her bankruptcy case if she knew the lawsuit would have no value.  Transcript at 55.
She added, "if I had been told that it would not merit me anything, I would not have
filed."  But in the objection to the trustee's proposed settlement she filed, she told the
Court, "I filed bankruptcy as a result of my income being reduced in 2003 & 2004 from
approximately $46,000 a year to $25,000 in 2005.  I was forced early retired due to a
medical disability."  Proceeding No. 38.

She also testified:

Q.      And so when you filed bankruptcy many months or a year later, you filed
        for approximately twenty-two – the actual amount should have been, I
        believe, twenty-two thousand dollars in unsecured debt.  Of that
        unsecured debt, what was actually used – what portion of that credit was
        used for your house fire?

9

A.      Approximately thirteen or fourteen hundred dollars.

Q.      Thirteen or fourteen hundred dollars?

A.      Correct.

Q.      So you would say that the majority of what you filed bankruptcy did not reflect against your house fire?

A.      No.

Transcript at 41-42.

The Court must conclude that Ms. Tarrant's bankruptcy filing cannot be attributed mainly to the fire and the problems it caused. Of the $29,221 in unsecured debt Ms. Tarrant listed in her bankruptcy petition, (she testified it was $22,000), $1,300 to $1,400 was attributable to fire related expenses. When Ms. Tarrant retired from her job, she was making about $20,000 less income. She testified she was, "falling behind, and it seemed as if I was going to have to file bankruptcy." Transcript at 42.

## C.  The Settlement Negotiations

One of Ms. Tarrant's frustrations was that she did not participate in the mediation seeking a settlement of her action. She testified:

Q.      Were you ever represented during the mediation between Horace Mann, the bankruptcy trustee, I believe the mediator, were you, Edith Tarrant, the named plaintiff in the case, were you ever represented in the mediation for settlement?

A.      No.

Q.      So no one ever heard – has anyone ever heard your case?

A.      No.

Transcript at 48-49.

## D.  Ms. Tarrant's Opposition to the Settlement

Ms. Tarrant's objection to the proposed settlement is entitled <u>Complaint</u>. Proceeding No. 38.

Of particular note, her "Complaint" reads, "None of the creditors have filed a dispute in the discharge of this unsecured debt; nor were they present for the

10

bankruptcy hearing. If no claims have been made. The bankruptcy trustee should not be involved." Complaint, filed May 9, 2006, Proceeding No. 38.

That process is unusual and difficult at times for even those trained in bankruptcy matters. In its "Bankruptcy Basics," the Administrative Office of U.S. Courts offers this excellent explanation of a trustee's role in a Chapter 7 case. It reads:

### Role of the Case Trustee

When a chapter 7 petition is filed, the U.S. trustee (or the bankruptcy court in Alabama and North Carolina) appoints an impartial case trustee to administer the case and liquidate the debtor's nonexempt assets. 11 U.S.C. §§ 701, 704. If all the debtor's assets are exempt or subject to valid liens, the trustee will normally file a "no asset" report with the court, and there will be no distribution to unsecured creditors. Most chapter 7 cases involving individual debtors are no asset cases. But if the case appears to be an "asset" case at the outset, unsecured creditors (7) must file their claims with the court within 90 days after the first date set for the meeting of creditors. Fed. R. Bankr. P. 3002(c). A governmental unit, however, has 180 days from the date the case is filed to file a claim. 11 U.S.C. § 502(b)(9). In the typical no asset chapter 7 case, there is no need for creditors to file proofs of claim because there will be no distribution. If the trustee later recovers assets for distribution to unsecured creditors, the Bankruptcy Court will provide notice to creditors and will allow additional time to file proofs of claim. Although a secured creditor does not need to file a proof of claim in a chapter 7 case to preserve its security interest or lien, there may be other reasons to file a claim. A creditor in a chapter 7 case who has a lien on the debtor's property should consult an attorney for advice.

Commencement of a bankruptcy case creates an "estate." The estate technically becomes the temporary legal owner of all the debtor's property. It consists of all legal or equitable interests of the debtor in property as of the commencement of the case, including property owned or held by another person if the debtor has an interest in the property. Generally speaking, the debtor's creditors are paid from nonexempt property of the estate.

The primary role of a chapter 7 trustee in an asset case is to liquidate the debtor's nonexempt assets in a manner that maximizes the return to the debtor's unsecured creditors. The trustee accomplishes this by selling the debtor's property if it is free and clear of liens (as long as the property is not exempt) or if it is worth more than any security interest or lien attached to the property and any exemption that the debtor holds in the property. The trustee may also attempt to recover money or property under the trustee's "avoiding powers." The trustee's avoiding powers include the power to: set aside preferential transfers made to creditors within 90 days before the petition; undo security interests and other prepetition transfers of property that were not properly perfected under nonbankruptcy law at the time of the petition; and pursue nonbankruptcy claims such as fraudulent conveyance and bulk transfer remedies available under state law. In addition, if the debtor is a business, the bankruptcy court may authorize

Case 05-12841-BGC7    Doc 47    Filed 09/25/06    Entered 09/25/06 12:25:16    Desc Main
Document    Page 11 of 36

the trustee to operate the business for a limited period of time, if such operation will benefit creditors and enhance the liquidation of the estate. 11 U.S.C. § 721.

Section 726 of the Bankruptcy Code governs the distribution of the property of the estate. Under § 726, there are six classes of claims; and each class must be paid in full before the next lower class is paid anything. The debtor is only paid if all other classes of claims have been paid in full. Accordingly, the debtor is not particularly interested in the trustee's disposition of the estate assets, except with respect to the payment of those debts which for some reason are not dischargeable in the bankruptcy case. The individual debtor's primary concerns in a chapter 7 case are to retain exempt property and to receive a discharge that covers as many debts as possible.

(www.uscourts.gov/bankruptcycourts/bankruptcybasics).

From this description, it is clear that a trustee has certain responsibilities regardless of creditors' participation.

### E.  Ms. Tarrant's Position on the Value of the Settlement

Ms. Tarrant believes that her cause of action, including punitive damages, is worth about $200,000.

She testified:

MS. FOY:  What is the total amount that you are seeking for punitive damages as well as your unpaid expenses from your insurance company?

MS. TARRANT:  If I had – do I have a choice of saying this because I am thinking sixty-eight thousand – the two hundred – I would say two hundred and – I think I added it up – punitive damages two times what you are owed or whatever, and I am looking at sixty-eight thousand dollars, plus two times that amount, which would be around two hundred and some thousand dollars.  That is what I would seek if I could seek punitive damages.

Transcript at 53.

She testified that she discussed this amount with her attorneys.

A.    I went in and talked with Don Hall but we never did reach a dollar amount because I was asked – I was led to believe that it was going to be more than fifty thousand but, after the bankruptcy when you and I went in and talked to him, he said, well, he felt that it was never going to be more than fifty thousand anyway, and I was not led to believe that.  He never told me that when I went in and spoke with him on many occasions concerning it. I was under the impression that it was going to be much more.

12

Q.	You know, considering that you hired Don Hall or Tommy Tucker to represent you, what dollar amount did you actually state to Don Hall that you wanted to sue them for?

A.	Two hundred thousand.

Q.	And when did you say that amount to him?

A.	When I found out that he had asked – well, I had thrown some figures around a while back about that but actually on the day that we went in and the mediator asked him how much he was asking for, I think he said, "Oh, well, I guess a hundred and twenty-five thousand," was the figures that he gave that day and that's when I said, "Why would you ask for a hundred and twenty-five, why not two hundred thousand?"

Q.	So you are stating that he advised you that he was asking for a hundred and twenty-five thousand dollars?

A.	On the first day that we went in for mediation.

Q.	And so when was it brought to you that they were negotiating a settlement then for forty-eight thousand?

A.	At first they were negotiating thirteen thousand and then it went from that up to that amount on the second – well, on the second mediation they said that they could not reach –

Transcript at 46-47.

And she explained that she would not agree to any amount that did not produce a dividend for her.  She testified:

MS. FOY: If a settlement is reached for fifty thousand dollars, would you agree to a settlement – would you agree to a settlement of fifty thousand dollars at this point with Horace Mann if it is to be split amongst your creditors and yourself?

MS. TARRANT: If it is between my creditors and myself, but if it is to the point where I would receive nothing, no.

Transcript at 52.

She explained further on cross examination by the trustee:

Q.	Ms. Tarrant, as I have understood your testimony, you would object to a settlement for fifty thousand dollars if it meant that you would not receive anything; is that correct?

13

A.      Yes.

Q.      And would you object to a settlement for fifty-five thousand dollars if it meant that you would not receive anything?

A.      For fifty-five thousand?

Q.      Yes, ma'am.

A.      Yes.

Q.      Would you object to a settlement for sixty thousand dollars if you would not receive anything?

A.      First of all, why would I not receive anything?  I mean, can I say that or do I just have to keep saying –

Q.      No, you should answer my question is what you should do.

A.      Okay, sir.

Q.      My question is if we had a proposed settlement for sixty thousand dollars and as a result you were not going to receive anything, would you object?

A.      Yes, I would.

Q       Isn't the real reason for your objection that you are not going to receive anything?

A.      Yes, that is a portion of it, yes.

Transcript at 53-54.

It is apparent that unless a settlement included some dividend for Ms. Tarrant, she would object.

## F.  Evidence in Support of the Settlement

Mr. Don Hall, the attorney representing the trustee in this matter testified in favor of the settlement.  Mr Hall has practiced law for about 17 years.  He testified, "All of my work has been in civil litigation with the majority of it being plaintiff's personal injury, wrongful death, insurance-related matters, both homeowner's as well as some commercial and automobile, but mainly personal injury cases for the plaintiff is my primary practice and has been the whole time." Transcript at 4.  He has had numerous occasions to prosecute similar claims and at the time of trial had three such matters ongoing. Transcript at 7.

14

Mr. Hall described the root of many of Ms. Tarrant's problems. He testified:

Basically Ms. Tarrant had a fire at her home that evidently was an electrical fire. They really never did determine the cause, but it happened, from what I recall, September 12 of 2003, and her home was significantly destroyed as a result of the fire, and Ms. Tarrant made a timely claim with her insurance company and there was an investigation and numerous contacts between Ms. Tarrant and the insurance company and the adjusters that were assigned to handle the claim, including Darla Frazier, Felix Alexander and it went over a significant amount of time, at least a year, probably more, she was dealing with all of this because they were doing repairs to her house and they had her living in other locations. They had issues relating to her living expenses and her cost of repair and who was doing the repair and how timely they were. But those are the facts in a nutshell, basically what all she had to deal with from the standpoint of when the fire occurred and how they handled the claim and how they dealt with her.

Transcript at 7-8.

Mr. Hall and Ms Tarrant met in May 2004 when he took over handling her case from a member of his firm. The state court lawsuit was filed in June 2004. That complaint included three causes of action relating to insurance. Those were: (1) breach of contract; (2) bad faith; and (3) fraud.

## 1. Breach Of Contract

Mr. Hall explained that Ms. Tarrant's breach of contract action was made up of three components. He testified:

Q.    Under your contract theory of recovery, what type of damages was Ms. Tarrant entitled to receive under the claim that was brought?

A.    Under the contract theory, the main issue in the case concerned her contents coverage. I will try to explain how I understood the contract that Horace Mann had and I am sure these other guys that defended Horace Mann will have a better explanation of how the coverage works. But basically you can divide up a homeowner's coverage into three areas. There is the **living expenses** that you need during the time that you are out of your home and have to be taken care of, you know. There is a **building coverage** that covers the repairs to the home or replacement of the home if necessary, which is the majority of any homeowner's coverage, at least in terms of the limits. And then there is **contents coverage** for the items that are destroyed in the home.

Transcript at 8 (emphasis added).

Mr. Hall also testified that Ms. Tarrant's building coverage was $100,000, her contents coverage was $68,780, and her living expenses coverage was probably the same as the contents. Transcript at 8-9.

### a. Living Expenses Coverage

One component of the contract action relates to Ms. Tarrant's living expenses. Apparently Ms. Tarrant misunderstood early in the process how much she would be allowed to spend on living expenses. Ms. Tarrant testified:

> Q. And living expenses, approximately how much in dollar amount would you say that your living expenses were for the eleven months that you were out of your home?

> A. Thirty thousand or more because I had, you know, a portion of the money that I had, I spent largely because I was misled to believe that it didn't matter what I spent, that I would be reimbursed. Therefore I spent a lot of out-of-pocket money not realizing that I was not going to be reimbursed for this because I was told that I would receive a hundred and fifty dollars per week for food, and she should go ahead – I was instructed to go ahead and do this and then I would be reimbursed but I wasn't.

Transcript at 44.

But Mr. Hall explained how that coverage was limited. He testified, "But, you know, she is not entitled to the full sixty thousand in coverage there unless it is expended, and there wasn't any evidence that it was expended by her or by anybody else for living expenses." Transcript at 33.

### b. Building Coverage

Another component of the contract action is building coverage. Mr. Hall testified that the insurance company paid over $90,000 towards the repair of Ms. Tarrant's home, thus they did not deny her claim. Transcript at 9. He described his understanding of why those monies were required and why he did not believe that other causes of action existed against the insurance company. He testified:

> Q. In other words, at the time that the house, the fire, is there a responsibility to replace the value of the house or to make the house back like it was? What is the insurance responsibility in that kind of claim?

> A. My understanding is they are supposed to make it like it was, make her whole basically up until the terms of – this is all contractual. It is all governed by the contract, and so they were going to repair the home. Now they made some representations to her that, you know, we are going

16

to get you another house if it is over this amount but those really weren't actionable because there weren't any actual damages that resulted from that.

Q.   So did the insurance company undertake to rebuild the house or did they provide the ninety thousand dollars to Ms. Tarrant with which to rebuild the house?

A.   They provided the money.  Basically Ms. Tarrant had to find the contractor to do the work and negotiate that, and the insurance company would pay periodically the amounts that were owed for the work that was done.

Q.   So if I have understood you correctly, as far as the real estate part of it, the payment of the ninety thousand dollars was, in all likelihood, substantial satisfaction of the insurance company's requirements under the contract unless there was something else that you had not been made aware of?

A.   Right.  I think that is fair to say.

Transcript at 10-11.

In addition, he testified that Ms. Tarrant suffered other "building" related damages which were not necessarily related to insurance coverage.  He testified, "I don't think those claims were going to be effective against Horace Mann.  I think those claims were going to be against Frederick Scott, the guy that messed up her work on the home, and <u>those claims are still pending</u>." Transcript at 10 (emphasis added).

### c.  Content Coverage

Another component of the contract action against the insurance company relates to Ms. Tarrant's content coverage.

Ms. Tarrant's content coverage was $68,780.  Mr. Hall explained that regardless of Ms. Tarrant's losses, she would be limited to that amount, but Mr. Hall testified that he believed that Ms. Tarrant's best chances of success were in regard to her claim for contents.  He explained:

But the damages as I believe they existed, and that we had a strong argument to obtain, were in relation to the contents because things were told to Ms. Tarrant, or at least allegedly told, and we had some evidence in the file that helped us with that, was that she would get her full contents.  She would get the full sixty thousand.  She ended up getting – they say they paid her twenty-five thousand. It was always our contention they paid her about twenty thousand under the contents coverage because some of that was used to pay off her air-conditioner.

Transcript at 9-10.

17

## 2. Bad Faith

A second cause of action against the insurance company was bad faith. This claim is of course the one that Ms. Tarrant apparently bases her contention that she is entitled to punitive damages which are the majority of the $200,000 she believes she should receive from the insurance company.

After investigating the matter, Mr. Hall did not believe that Ms. Tarrant's bad faith claim against the insurance company would be successful. His primary reason is that the company never denied Ms. Tarrant's claim. He testified:

> A.  You have to prove – one, you have to prove a breach of the contract which is an element that is the first element of any bad faith claim, and that is where we were going to have difficulty because that issue was always disputed and it wasn't where they completely denied the claim. **There was never a denial.** We were kind of trying to go on a theory of them either not adequately investigating or taking some measure that way, but I think the merits of that claim were not good for us.

> Q.  Did you have any opinion or estimate as to the probability of succeeding in making a recovery at trial in connection with the bad faith claim?

> A.  Well, let me kind of clarify a little bit of that because I think one of the reasons, you know, I wanted to get involved in the case is because of where it was located in Bessemer where I practice. **And so we were going to have a very difficult road to get the trial court to even allow bad faith to go to the jury.** And even if we didn't get – if you want to put it in percentages, I would say less than – we had a less than thirty percent chance of being successful in any kind of bad faith theory and, even if we were successful – and that is at the trial court level. **Even if we had a huge verdict from that and it got appealed, we would even have less of a chance on appeal**.

Transcript at 13-14 (emphasis added).

## 3. Fraud

A third cause of action was for fraud. Mr. Hall testified that the allegations of fraud were aimed at, "what the adjuster said, not really so much what Horace Mann's employee said." Transcript at 7.

18

#### 4.  Mr. Hall's Recommendation

Mr. Hall testified that the parties mediated this matter for, "a good part of two days...." Transcript at 15.  The result was, "The defendants have agreed to pay, and I am just talking about the insurance defendants and the adjusting company, has agreed to pay forty-eight thousand, five hundred dollars." Transcript at 15.

When asked, " And in your judgment and professional opinion, is that a fair and reasonable settlement of the issues that were raised in the case relative to the facts?" he relied, " I think it is." Transcript at 15.

#### 5.  Factual and Practical Reasons to Support the Settlement

After analyzing Ms. Tarrant's claims, Mr. Hall became very practical, as all attorneys must when evaluating similar claims.  He explained that the defendant's actions and Ms. Tarrant's bankruptcy filing had profound effects on her claims.  He testified:

Q.    Do you have a recollection as to the dollar amount of the damages that you had evidence that you thought you could prove at trial on behalf of Ms. Tarrant in connection with the contract claim?

A.    Well, as far as actual contractual losses, I felt like what the evidence was going to show, based on what Ms. Tarrant was telling me, was, you know, they paid over ninety thousand dollars to do the repairs to the home.  And when I am talking about "they," I am talking about Horace Mann.  This wasn't a situation where they came in and completely denied the claim. There was a lot of problems with delays and things like that which you really don't have a claim for because Alabama doesn't recognize negligent handling of a claim, **but they recognized the claim and that was always a big factor in the case because I think it virtually destroyed the merits of a bad faith claim**.

Transcript at 9.

Mr. Hall also addressed the impact of the bankruptcy filing.  The testimony reads:

Q.    There is one additional factor that I suppose should be evaluated in contemplating the merits of this compromise and that is the existence of the bankruptcy, the appointment of the trustee, and the trustee becoming the real party-in-interest in connection with the lawsuit.  Is it your understanding as a matter of law that this claim in the state court would have to be prosecuted by the trustee on behalf of the bankruptcy estate?

19

A.      Yes.  And, in fact, when the defendants' attorneys found out Ms. Tarrant
        had filed bankruptcy, they immediately filed a motion to stay, which is
        automatic in the trial court.  And in order for us to even get the case going
        again, we had to substitute the trustee to get the case moving, and the
        case law is pretty clear that the real party-in-interest is going to be the
        trustee.

Q.      And in what way does that influence or affect the case, the value of the
        case and the prospects of success for the case?

A.      **It obviously reduces it significantly in my opinion.  It takes out a lot
        of the personal nature of the losses in the case**.

Transcript at 14 (emphasis added).

        A similar exchange occurred between Mr. Hall and Ms. Foy.  It reads:

Q.      Initially when we were discussing the value of her case, you stated earlier
        that you didn't feel like it was worth no more than the contents was forty
        thousand dollars –

A.      Well, I think —

Q.      I am sorry.

A.      I am sorry.  You go ahead and ask your question.

Q.      Forty thousand dollars you discussed for contents.  I believe Ms. Tarrant
        received nine thousand odd dollars that was used towards living
        expenses.  Do you recall that she had out-of-pocket expenses and she
        was not reimbursed for living expenses and would it be fair to say that
        nine thousand dollars  when she was – if nine thousand dollars was only
        allowed – I am sorry.  The maximum amount allowable through her
        insurance policy was sixty thousand, seven hundred and eighty dollars for
        living expenses.  Only nine thousand dollars was used or was paid out by
        Horace Mann.  However, she was out of her home for approximately
        eleven months and she had expenses incurred from there that was out of
        her pocket expenses and she used the twenty-five thousand dollars from
        her contents toward that.  Do you recall her stating that to you?

A.      I don't recall that, those figures being thrown out there.  I know there was
        – like I said earlier, Ms. Tarrant – and she is a sweet lady and I am sorry
        all of this happened like it did, but, you know, **you have got to look at
        what was paid out and what wasn't paid out.  And Horace Mann paid**

**out over a hundred and thirty something thousand dollars toward her claim, not including this settlement amount. So there were going to be always in the back of my mind problems with a jury, even if this bankruptcy matter didn't matter or didn't happen, about what is she going to be entitled to. And her living expenses are only going to be what it was. You know, if some expenses weren't paid, you know, I don't think it was going to be enough to make much of a difference.**

Q.     But you are making a statement that a hundred and thirty thousand dollars was paid on approximately two hundred and sixty thousand dollars. You know, we haven't even used the fact that they advised her – her personal – the building, I am sorry, the contents –

....

Q.     Do you recall the conversation in reference to her – I am sorry – her home being torn down instead of being rebuilt?

A.     Yeah, and I think I mentioned that earlier. That was one of the things she claimed. You know, the problem is these contracts are worded very favorably to the insurance companies, and I think they make – they ultimately make those decisions. So I don't think we were going to have much success in trying to claim that she should get, you know, the full amount of her contract. **That just, I don't think, was going to happen.**

Transcript at 30-32 (emphasis added).

## G.  Application for Compensation and Expenses

Mr. Hall's law firm was approved as attorneys for the trustee by order of this Court on December 8, 2005. The terms of that employment were the same as the terms the attorney and Ms. Tarrant entered when she employed him. The most pertinent provision is that Mr. Hall's firm would be paid a forty percent fee, plus expenses, if he was able to recover against the defendants.

As discussed below, the question for the Court is whether that fee is reasonable and the work performed for it was necessary.

### 1.  Mr. Hall's Testimony in Favor of the Application

Mr. Hall testified on behalf of his application:

Q.     Now, Mr. Hall, you submitted a fee application to this court in connection with your representation of the trustee in the prosecution of this claim; have you not?

21

A.     I believe so.

Q.     And what was the amount that you had asked to be paid in connection with your services?

A.     The amount according to our contingency fee agreement is a forty percent fee, and I am not sure of the figures. I don't have that in front of me.

Q.     Well, let me refresh your recollection. The expenses that were asked to be reimbursed were five hundred and thirty-four dollars and forty cents. Did your office in fact incur actual out-of-pocket expenses of that amount?

A.     Yes.

Q.     And have you submitted to the bankruptcy administrator's office to their satisfaction whatever information they have asked concerning those expenses?

A.     Yes.

Q.     Any issue that you are aware of that has been raised with respect to the reimbursement of those expenses by the bankruptcy administrator's office?

A.     No.

Q.     The second component of your claim is in connection with the contingent fee, and that amount is shown in the amount of nineteen thousand, one hundred and eighty-six dollars and twenty-four cents. Would that be taking the settlement amount, subtracting the expenses and then applying a forty percent contingency?

A.     I think that's right. I believe that's how I came to that figure.

Q.     Now was this – how long have you been working on this case?

A.     I have been working since May of 2004.

Q.     And have you had one or more meetings with Ms. Tarrant in order to gather facts and information?

A.     I would say I have had at least five meetings with Ms. Tarrant, maybe more, some of them lasting multiple hours. There are times where we sat down when we got discovery, when we got the claims file from GAB Robins, when we got the claims file from Horace Mann, we would sit down and go through everything they were claiming.

Q.   So has the Circuit Court case proceeded through the discovery phase?

A.   No, it was still in the early stages of that because we were going to get her deposition taken care of when the bankruptcy issue became involved. So there were a substantial amount of expenses that were still going to be incurred, but we had a good understanding of, you know, at least what the parties were going to be claiming.

Q.   Do you have any opinion or estimate of the time that you have expended in attempting to further prosecute this claim?

A.   You know, I don't keep up with my time but I can conservatively say that I have spent – when you file a claim of this nature, you have to file it with specificity and detail the facts. With all of the meetings, with us preparing for the depositions, reviewing the documents which I have half of my file here, it was twice that big, it has been at least a hundred hours.

Q.   And have you received any compensation as a result of the services that you have rendered in connection with this case?

A.   None yet other than paying out money, expenses.

Q.   And have you or your firm advanced all of the expenses that were incurred in connection with the prosecution of this case?

A.   Yes.

Q.   And is there any agreement that exists between you and any other party in connection with the sharing of compensation that you might receive by order of this court in connection with the settlement of this case?

A.   No. The fee agreement is between me and Ms. Tarrant and the trustee.

Q.   And is your compensation that you are asking to be received entirely a result of the services that you rendered in connection with the prosecution of this lawsuit?

A.   Absolutely.

Transcript at 16-19.

## 2. Ms. Tarrant's Opposition to the Application

Ms. Tarrant objects to Mr. Hall's application for compensation and expenses. Many of her arguments are the same as those discussed above.

23

On cross examination of Mr. Hall, conducted by Ms. Foy on behalf of Ms. Tarrant, Mr. Hall's work and the fees and expenses he has requested were questioned. That exact testimony explains Ms. Tarrant's position much better than this Court could in summary. Thus, a significant amount of that testimony is reproduced here.

### a. Amount of Work

First, Ms. Tarrant questioned the amount of work performed by Mr. Hall and his firm. Mr. Hall's testimony reads:

Q.  And so in December of 2003, until you initially filed the lawsuit in July of 2004, those seven months, what was actually done by your law office?

A.  I am not sure what all Tommy did. You know, we don't keep like time sheets or anything. I know he probably met with Ms. Tarrant.

Q.  Okay. And so July – we will say in July of 2003 when you did file the lawsuit –

A.  2004.

Q.  I am sorry. In July of 2004 when you filed the lawsuit and Horace Mann responded to all of your answers and responded with the interrogatories and so forth, from 2004 until her bankruptcy case filing, what was done by your law office?

A.  Well, we did all of the paper discovery, you know. We did further investigation in terms of meeting with Ms. Tarrant and talking to her about the claims files, but that was pretty much it. We were in the next phase of going through depositions when the bankruptcy issue hit.

Q.  But no depositions was actually done; is that correct?

A.  No. Typically in these kind of cases, you know, because it involves issues of fraud, the plaintiff's deposition is taken first. And it seems to me that the deposition was scheduled, Ms. Tarrant's was, on previous occasions but cancelled because of conflict with one or the other attorneys, which is not uncommon.

Q.  Okay. I am going to state for the record in September of 2004, when the lawsuit was filed, there was a motion requested approximately a year later, 4-2005, from yourself, as well as the attorneys for Horace Mann, where you all said that you all weren't ready for trial and you requested a continuance. Is that correct?

Case 05-12841-BGC7    Doc 47    Filed 09/25/06    Entered 09/25/06 12:25:16    Desc Main
Document    Page 24 of 36

A.      That's right. I think there was a continuance request because we still had a lot of discovery ongoing.

Q.      Okay. So from, again, from 2004, July of 2004, until October of 2005, when she filed bankruptcy, there was nothing done by your law office?

A.      The paper discovery was done. You know, issuing interrogatories, request for production. There were letters written back and forth because some of the file that was sent to me was not – I didn't think it included everything once I reviewed it. I think there was even motions to compel filed against one or more of the defendants because of their failure to answer discovery. So I am not going to say there wasn't anything done. I don't think there was any depositions taken but there was a lot of paper work.

Q.      The notice of discovery was done in October of 2004. So three months after the lawsuit was filed, that's when those discoveries was done. After that, there was nothing else done by either attorney?

A.      Notice of discovery of what?

.....

Q.      Well, I am saying do you agree, then, with – I mean, you said that you all filed a notice of discovery, a service of discovery, and that was done in October of 2004.

A.      No, we filed discovery with the complaint. Now we may have filed additional discovery in November of 2004. I don't recall. That is not uncommon, but I don't recall any notice, and a notice of service is just a filing with the Circuit Court saying we are filing this discovery because discovery is not normally filed in court. But my recollection is we went back a lot over what documents they presented, especially, I think, in regard to what duties and responsibilities an adjuster has.

Q.      Through your experience as an attorney and pursuing lawsuits, is it typical that you would just immediately file a lawsuit for a client rather than issuing a demand to the insurance company?

A.      I have done it both ways. In this situation we were talking about a good bit of time that had already passed, so I wanted to go ahead and get the lawsuit pending.

Q.      Okay. So there was not a demand issue?

A.      Not to my knowledge.

Q.      And then after, you know, the discoveries was done between you and
        Horace Mann, did you ever initiate a settlement prior to her filing
        bankruptcy?

A.      Never.

Q.      Is there a reason for that?

A.      I always try to get my cases ready to be tried and, if there is any issue or
        potential of settlement, that is usually brought up in the course of just
        preparing your case.

Transcript at 20-25.

## b.  Value of the Lawsuit

Second, Ms. Tarrant questioned the value of her lawsuit after filing bankruptcy.
Mr. Hall's testimony reads:

Q.      When Ms. Tarrant seeked counsel, did you all ever discuss a dollar
        amount, what her case was worth, prior to her filing bankruptcy?

A.      Not to my knowledge.

Q.      Okay.  So what type of assumption did you make of what the dollar
        amount of her case was?

A.      I didn't make an assumption.  I felt it had value; otherwise I wouldn't have
        filed it; but I never made a determination of what it was worth.  A lot of that
        was going to depend on, you know, how the facts laid out and played out.

Q.      You stated earlier that you felt like her – you sued them for breach of
        contract, bad faith and fraud, and you had told me and Edith in a meeting
        that we had with you after her bankruptcy that you felt like it would be hard
        to prove the bad faith and fraud.  At any point after you filed the lawsuit
        and you received the answers from Horace Mann stating that they were
        denying the bad faith and the fraud, did you at any point tell her that her
        case was less in merit or value because there was no bad faith or
        because there was no fraud?

A.      I told her, I think more so after the bankruptcy was done because I told
        her it was going to hurt her case by doing that.  As far as the – I don't
        know that we ever got into the issues discussing what the claims were, but
        I typically don't get my clients involved in that, you know, because I am

26

trying to get the most money I can for them because it is going to benefit
me as much as them.

Transcript at 25-26.

### c.  Other Defendants

Third, Ms. Tarrant questioned the attorneys work in regard to other defendants.
Mr. Hall's testimony reads:

> Q.      Ms. Tarrant hired you for not only her lawsuit for Horace Mann but also a
>         lawsuit for Frederick Scott.
>
> A.      Right.
>
> Q.      Is there a reason why you decided to pursue the lawsuit against Horace
>         Mann and not pursue, after she filed bankruptcy, not pursue Frederick
>         Scott with the same effort?
>
> A.      No, I pursued all of them.  And, in fact, I filed a motion to compel against
>         Frederick Scott for his failures to answer discovery.  He has got a different
>         situation but those claims are still pending against him.

Transcript at 26.

### d.  Expenses

Fourth, Ms. Tarrant questioned the expenses claimed.  Mr. Hall's testimony
reads:

> Q.      You stated earlier that you had expenses, five hundred and thirty-two
>         dollars.
>
> A.      Right.
>
> Q.      What were those expenses for?
>
> A.      The majority of them, I think, were the filing fee, which I know was over
>         three hundred dollars.  I don't have those figures, like I said earlier.  And
>         then the rest of them were probably either postage or copying costs
>         related to the filing we got from the defendants.

Transcript at 26.

27

### e. Contingency Fee

Fifth, Ms. Tarrant questioned the contingency fee, the same amount as the one in her contract with Mr. Hall's firm. Mr. Hall's testimony reads:

Q.     Do you normally ask for a forty percent contingency fee without even initiating a lawsuit from anyone or is it typically thirty-three percent prior to filing if a lawsuit is not filed and forty percent afterwards, or do you always seek forty percent?

A.     I don't always seek forty percent, no. Most of my contracts, contingency fee contracts, are on a forty percent basis. A lot of them are on a fifty percent basis depending on the nature of the case. I try to not do a third. I always do more than that. There are occasions where I will go to a third but the majority of them are forty percent and have been since I have been practicing.

Transcript at 26-27.

### f. Hours

Sixth, Ms. Tarrant questioned the number of Mr. Hall's hours of work. Mr. Hall's testimony reads:

Q.     You stated also that you felt that you have put about a hundred hours into this case. Was that a hundred hours when you were the attorney for Edith Tarrant, or was a portion of those hours after you was retained by the trustee?

A.     Both. That includes both.

Q.     Approximately how many hours was put into this case after, you know – I know it is hard to say but –

A.     It is.

Q.     But after her bankruptcy was filed, approximately how many hours was put into the case?

A.     Gosh, that is going to be – it is all kind of a guess at this point, but I would say after the bankruptcy, because we really the things that were done were more in relation to the mediation once the bankruptcy – well, no, wait, I take that back. You are talking about after she filed bankruptcy?

Q.     After she filed bankruptcy, yes.

28

A.     Okay.  Because after she filed, you know, is when they filed the motion to stay and I filed objections to that motion to stay, and then we had to make application with the bankruptcy court.  So, you know, probably – and then the mediation time.  I would say probably sixty hours before she filed and forty hours after she filed, but all of it has been in connection with pursuing these claims in Circuit Court.

Transcript at 27-28.

### g.  Special Attorney

Seventh, Ms. Tarrant questioned which attorney the trustee hired.  Mr. Hall's testimony reads:

Q.     When me and Edith Tarrant came to your office, I believe in April, we wanted to see some of the things that you had done in reference to her case, so we went over all of the files.  And one question that I remember asking you was in reference to the special counsel.  Was there a reason why Tommy Tucker was requested as special counsel instead of yourself because you had been the one that really had been working the case.  I understand you guys are both in the same law office but you had been working the case predominantly as opposed to Tommy, and it was also stated that the reason why Tommy Tucker referred the case to you was because he was incapable really of trying a case like this.  So –

A.     I don't think that's the reason but do you want me to explain?  Go ahead.  I am sorry.

Q.     Well, do you recall the conversation when I asked you why was Tommy Tucker hired as special counsel and you said because he knows the trustee, he is more familiar with the trustee, had a relation –

A.     My recollection of that conversation was I told you that Tommy and I are equal partners in the same firm, so it really didn't matter, but I think Tommy – I knew Tommy had known and dealt with Mr. Tom Reynolds before, the trustee, and I had something else going on, so he made the call and signed the agreement on behalf of our firm, and he signed it that way.

Q.     If I recall correctly – I am not sure – I believe the special counsel reads as Tommy Tucker.

A.     Tommy Tucker with Hall and Tucker, I think.  Hall and Tucker is on there, but he signed it, you know, on our firm's behalf and I disagree that he

29

doesn't have the capability to handle this case, but the way we divvied up our firm is I am handling most of the civil stuff.

Q.      So he is familiar with cases?

A.      Yeah, he has handled cases like this.  I don't think he has had as much experience as I have had in it.  In fact, I know he hasn't.

Transcript at 28-29.

## V.  Additional Conclusions of Law

### A.  Approval of the Settlement

The court in In re Bard, 49 Fed.Appx. 528, 2002 WL 31371984 (6th Cir. Oct 15, 2002) explains the general rule. That is, "The Federal Rules of Bankruptcy Procedure specifically grant a trustee the authority to seek a compromise or settlement of claims available to the debtor or debtors, upon motion and after notice and a hearing. See Fed.R.Bankr.P. 9019(a)."  Id. at 530 (unpublished opinion).  The court added, "The very purpose of such a compromise agreement 'is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims.'" Id. (citation omitted).

And the court in In re Degenaars, 261 B.R. 316 (Bankr. M.D. Fla. 2001) explains, "Any compromise agreed to by a trustee or by a trustee's special counsel in a damages action that is property of the estate has no effect until approved by a bankruptcy court under Rule 9019, Federal Rules of Bankruptcy Procedure." Id. at 319.  That court added, "Rule 9019 gives a court broad discretion in approving compromises. See In re Kay, 223 B.R. 816, 819 (Bankr. M.D. Fla.1998)."  Id.

This Court has had previous occasions to review settlement proposals in bankruptcy cases.  See In re Golden Mane Acquisitions, Inc., 221 B.R. 963, (Bankr. N.D. Ala. 1997) and In re Speir, 190 B.R. 657 (Bankr. N.D. Ala. 1995).  The standards this Court has applied in each case are those applied within this Circuit.  As described by the court in In re Kay, 223 B.R. 816 (Bankr. M.D. Fla. 1998) the process is:

In determining whether the December Settlement is fair and equitable, the Court must consider the following factors: (1) the probability of success in the litigation; (2) the difficulties, if any, to be encountered in the matter of collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interests of the creditors and a proper deference to their reasonable views in the premises. In re Justice Oaks II, Ltd., 898 F.2d 1544, 1549 (11th Cir.1990), cert. denied, 498 U.S. 959, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990).

30

Id. at 820.  The Court has applied those standards here, as required by the decision of the Court of Appeals for the Eleventh Circuit in <u>Wallis v. Justice Oaks II, Ltd., (In re Justice Oaks II, Ltd.), 898 F.2d 1544 (11th Cir. 1990)</u>, cert. denied sub nom. <u>Wallis v. Justice Oaks II, Ltd., 498 U.S. 959, 11 S.Ct. 387, 112 L.Ed.2d 398 (1990)</u>.

### 1.  The probability of success in the litigation

In summary, Mr. Hall testified that the probability of success on a bad faith claim was less than 30 percent and that when the insurance company admitted the claim, that is it did not deny it, that virtually destroyed the claim.  He added that the chances of recovering under any claim was greatly diminished when Ms. Tarrant filed her bankruptcy case.  He explained that the filing took the personal aspect out of the case.  He stated that he believed that there would always be problems with a jury.

Based on Mr. Hall's testimony and other evidence, the Court must find that the possibility of success in this proceeding, without the settlement, was very low.

### 2.  The difficulties, if any, to be encountered in the matter of collection

There is no evidence on this standard.

### 3.  The complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it

These matters do not appear to be very complex in their non-bankruptcy context.  As Mr. Hall noted, he has had numerous such cases and has several pending now.  However, after Ms. Tarrant filed bankruptcy, the issue of the trustee's relationship to the creditors, and Ms. Tarrant's relationships with the trustee and the creditors make these matters relatively complex.  The trustee is the plaintiff.  But he has not been injured; Ms. Tarrant was.  Not only would a jury be required to understand the underlying litigation, it would also be required to understand how that litigation and any recovery relates to Ms. Tarrant's bankruptcy case and estate.

Based on the evidence, the Court finds that this case is fairly complex, relative to similar non-bankruptcy matters.

### 4.  The paramount interest of the creditors and a proper deference to their reasonable views

The paramount interest of creditors is to receive a dividend from this case.  As the initial notice to all of them stated, this case is considered to be a non-asset case.  And based on the evidence the Court finds that would be, and most likely would remain one, if this settlement is not approved.

31

Therefore, based on the evidence, the Court finds that it is in the creditors' paramount interest for this settlement to be approved. It is unlikely that they would receive any dividends anywhere near the ones they will receive if this settlement is not approved.

### 5. Summary of Standards

Based on the above, the Court finds that the standards required to be considered weigh in favor of approval of the settlement and that the settlement should be approved.

### B. Approval of the Application for Compensation and Expenses

Award of compensation and reimbursement of expenses for a professional employed in a bankruptcy case pursuant to section 327 are governed by section 330 of the Bankruptcy Code. The pertinent parts of that section read:

(a)(1)After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, a consumer privacy ombudsman appointed under section 332, an examiner, an ombudsman appointed under section 333, or a professional person employed under section 327 or 1103–

(A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and

(B) reimbursement for actual, necessary expenses.

(2) The court may, on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest, award compensation that is less than the amount of compensation that is requested.

(3) In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including–

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

32

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)    (A) Except as provided in subparagraph (B), the court shall not allow compensation for--

(i) unnecessary duplication of services; or

(ii) services that were not--

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.

11 U.S.C. § 330.

Section 330(a) of Title 11 of the United States Code provides that the bankruptcy court may award reasonable compensation for actual, necessary services rendered by a trustee, examiner, and professional person employed in various capacities under the Bankruptcy Code. No one has objected to the fees requested; however, the determination of "reasonable" fees for services rendered in connection with the administration of bankruptcy cases is a judicial function, a responsibility which a bankruptcy judge affirmatively exercises, regardless of whether or not the fees requested in a particular instance are actually opposed by any party in interest. See, In re First Colonial Corp. of America, 544 F.2d 1291 (5th Cir.1977). And regardless of any action by a party in interest, the bankruptcy court has the authority to hold an evidentiary hearing on its own motion if petitions for compensation do not adequately develop the factual basis of a fee award. Similarly, if no objections are raised by parties-in-interest, including the Bankruptcy Administrator, the court retains the authority to award only reasonable compensation for actual and necessary services. In re Marker, 100 B.R. 569 (Bkrtcy. N.D. Ala.1989).

As described in In re First Colonial Corp. of America, 544 F.2d at 1299, and its progeny, Matter of U.S. Golf Corp., 639 F.2d at 1201, In re Beverly Mfg. Corp., 841 F.2d 365, 370 (11th Cir.1988), and Grant v. George Schumann Tire & Battery Co., 908 F.2d at 877, determining a reasonable fee in bankruptcy is a three step process.

First, the bankruptcy judge must ascertain the nature and extent of the services supplied by the applicant. To that end, each applicant seeking compensation must file a statement which, in essence, recites the number of hours worked and which contains a description of how each of those hours was spent. If there are disputed issues of fact relating to the application, an evidentiary hearing must be held.

Second, once the nature and extent of the services have been determined, the bankruptcy judge must access the value of those services, that is the reasonableness and necessity of the hours claimed and the hourly rate requested. A determination of the reasonableness and necessity of hours and rates requires consideration of the twelve factors first enunciated in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 171-719 (5th Cir.1974), a civil rights case, and made applicable to fee determinations in bankruptcy in In re First Colonial Corp. of America, 544 F.2d at 1298-1299. These are: (1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or other circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; and, (12) Awards in similar cases. Matter of U.S. Golf Corp., 639 F.2d at 1201; Grant v. George Schumann Tire & Battery Co., 908 F.2d at 877. A reasonable fee may then be determined by multiplying the reasonable hourly rate by the number of hours reasonably expended. Grant v. George Schumann Tire & Battery Co., 908 F.2d at 874.

Third, once the amount of reasonable compensation has been determined, the bankruptcy judge must briefly explain the findings and reasons upon which the award is based, including an indication of how each of the twelve factors affected the decision. In re First Colonial Corp. of America, 544 F.2d at 1300; Matter of U.S. Golf Corp., 639 F.2d at 1202; Grant v. George Schumann Tire & Battery Co., 908 F.2d at 878.

The purpose of the last requirement is to make the review of the fee determination meaningful. What is expected is "not a meaningless exercise in parroting and answering each of Johnson's twelve criteria, but some assurance that the court has arrived at a just compensation based upon appropriate standards." Matter of U.S. Golf Corp., 639 F.2d at 1206, quoting, Davis v. Fletcher, 598 F.2d 469, 470-71 (5th Cir.1979). However the "court's order on attorney's fees only need be specific enough to allow meaningful review...." Grant v. George Schumann Tire & Battery Co., 908 F.2d at 878, n. 10. Even though a bankruptcy court's fee determination may not explicitly state which of the findings was made pursuant to which of the twelve factors, the fee determination is sufficient if it is otherwise "clear that the court considered those factors." Id.

This Court has considered those factors here:

(1) The time and labor required is completely compatible with the nature of the matter and the recovery sought;

(2) The novelty and difficulty of the questions were no longer routine when Ms. Tarrant filed her Chapter 7 case;

(3) The skill requisite to perform the legal service properly needs to be specialized and the applicants demonstrated that they have those skills;

(4) The preclusion of other employment by the attorney due to acceptance of the case does not appear to be a factor here. Mr. Hall testified that he had several similar cases ongoing at the same time;

(5) The customary fee in similar matters appears to be the same 40 percent arrangement;

(6) Whether the fee is fixed or contingent is not important. This Court applies the same standards, but it is clear that a contingency arrangement is the norm;

(7) Time limitations imposed by the client or other circumstances do not appear to be a factor here;

(8) The amount involved and the results obtained are almost identical. The recovery is very similar to the amount of Ms. Tarrant's losses, without consideration of punitive damages;

(9) The experience, reputation, and ability of the attorneys are very good;

(10) The "undesirability" of the case is not a factor. The majority of Mr. Hall's practice is comprised of similar cases;

(11) The nature and length of the professional relationship with the client is not a factor; and,

(12) Awards in similar cases are probably similar, but there is no evidence on this point.

In considering the factors, the Court finds that the majority of the factors weigh in favor of the application.

In addition, as the application of these factors have been questioned over the years, the Court finds independent of the factors that the nature and extent of the services provided were satisfactory, the work was necessary, the hours spent were

Case 05-12841-BGC7    Doc 47    Filed 09/25/06    Entered 09/25/06 12:25:16    Desc Main
Document      Page 35 of 36

reasonable, the amount charged for the work performed and the hours spent are reasonable, and the application satisfies the factors described in section 330 above.

Based on the above, the Court finds that the application for compensation is due to be approved.

## VI. Order

It is therefore **ORDERED, ADJUDGED and DECREED** that:

1.      The trustee's <u>Motion to Approve Compromise of Controversy</u> is **GRANTED**;

2.      The debtor's objection to the compromise is **OVERRULED**;

3.      The <u>Application for Final Compensation and Reimbursement of Expenses for Special Counsel</u> is **APPROVED**;

4.      The debtor's objection to the application is **OVERRULED**;

5.      This order is a written opinion for purposes of the E-Government Act, Pub. L. No. 107-347 and shall be published as a Memorandum Opinion and Order.

Dated: September 25, 2006              /s/Benjamin Cohen _____
                                       BENJAMIN COHEN
                                       United States Bankruptcy Judge

BC:pb